FILED

03 JUN 23 PM 3:07

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STEVE THURMAN, an individual,

   Plaintiff,

v.                                                  Case No.: 8:03-cv-489-T-26MAP

THE CITY OF TAMPA, FLORIDA, a
Florida municipal corporation,

   Defendant.

---

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, ATTORNEY'S FEES, AND A DEMAND FOR JURY TRIAL

Plaintiff, STEVE THURMAN, an individual, sues Defendant, THE CITY OF TAMPA, FLORIDA, a Florida municipal corporation, and for his Complaint would allege as follows:

### I. PRELIMINARY STATEMENT

This is an action under the laws and Constitution of the United States alleging that THE CITY OF TAMPA, FLORIDA, by and through the actions of the Tampa Police Department, through the officers identified herein, acting in concert, as a matter of policy and practice, has with deliberate indifference failed to adequately discipline, train, or otherwise direct police officers concerning the rights of other police officers, resulting in the Defendant in this case to, as a matter of policy and practice, inspire and condone the unlawful conduct described herein. This conduct includes, but is not limited to, the deprivation of the Plaintiff's rights, privileges, and immunities under the Fourth and Fourteenth Amendments to the United States Constitution

16

and the laws of the State of Florida. This was accomplished through the impermissible and illegal imprisonment of the Plaintiff, against the rights and dignity of the Plaintiff, and in violation of Plaintiff's afore mentioned constitutional rights. The Defendant, as representative of the identified Tampa Police Department officers implementing the unconstitutional practices and policies of the Tampa Police Department, promotes a pattern and practice in the creation and maintenance of a hostile working environment, as hereinafter described. As a direct and proximate result of the wrongful acts, customs, and policies of the Defendant, all of which were committed under color of state law, Plaintiff, THURMAN, has suffered damages, as more thoroughly described herein.

## II. JURISDICTION

1. This is an action for declaratory and injunctive relief, damages, and attorney's fees.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 in that these matters arise out of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1985, and 1988.

3. The supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367. The supplemental matters arise out of Article I, §§ 2, 4, 5, 9, 10, 12, 21, and 23, and Article X, § 6 of the Constitution of the State of Florida.

4. Venue in this Court is appropriate under 28 U.S.C. Section 1391(b) as the actions about which the Plaintiff complains and from which Plaintiff seeks relief have occurred within this judicial district.

## III. PARTIES

5. Plaintiff, STEVE THURMAN, (hereinafter "THURMAN"), is an officer with the

Tampa Police Department. He graduated from the Tampa Police Academy on January 26, 1981 and was sworn in as an officer on May 1, 1981.

6. Defendant, THE CITY OF TAMPA, FLORIDA, (hereinafter "CITY") was and is a Florida municipal corporation. As a municipal entity, naming the CITY as a Defendant in this action contemplates the inclusion of the municipal agency of the TAMPA POLICE DEPARTMENT, (hereinafter "TPD"), BENNIE HOLDER, (hereinafter "HOLDER") Police Chief of the Tampa Police Department, TINA WRIGHT, (hereinafter "WRIGHT"), Assistant Chief of the Tampa Police Department, ANDREW STERZER, (hereinafter "STERZER"), an officer of the Tampa Police Department, JANE SILING, (hereinafter "SILING"), an officer of the Tampa Police Department, DANIEL GROSSI, (hereinafter GROSSI"), an officer of the Tampa Police Department, BURT MURRY, (hereinafter "MURRY"), an officer of the Tampa Police Department, DIANE KIRBY, (hereinafter "KIRBY"), an officer of the Tampa Police Department, and other officers of the Tampa Police Department unknown at this time.

## IV. GENERAL ALLEGATIONS

7. Plaintiff, STEVE THURMAN, (hereinafter "THURMAN"), is an officer with the Tampa Police Department. He graduated from the Tampa Police Academy on January 26, 1981 and was sworn in as an officer on May 1, 1981.

8. Prior to joining the City Police Department, THURMAN was active in the United States Army and was a decorated member of the Special Forces, having joined the Army in 1972 and having participated in the "conflict" of Viet Nam.

9. From 1985 to 1988, THURMAN served as a recruiter for the United States Army, having obtained the status as the top recruiter in the Southeast and the second most successful recruiter in the United States.

10. In 1989, THURMAN received his Masters in Public Administration from the Golden Gate University with emphasis on (1) organization and management and (2) police administration.

11. THURMAN has been in the U.S. Army Reserves since his participation in active duty with the U.S. Army.

12. In 1990 and 1991, THURMAN was called back to active duty to participate in "Desert Storm."

13. In June 1991, THURMAN returned from "Desert Storm" and shortly thereafter returned to his duties with the Tampa Police Department.

14. In 1991 and 1992, THURMAN participated in several highly controversial and critical investigations, including but not limited to extensive investigations into the following issues:

  a. Inaccurate municipal records in possible fraudulent activity involving the existence and/or character of well fields in the "New Tampa" area.

  b. The "Key Bank" investigation.

  c. Investigations into alleged "bid rigging" and purported "improprieties" involving bond payments, maintenance, inappropriate auctioning and other misfeasance and malfeasance related to the Tampa Police Department vehicle fleet.

  d. The purported wrongdoing involving officials and/or activities of the Tampa Housing Authority.

  e. Purported questionable practices involving the disposition of toxic waste by municipal authorities and/or agents.

      f.      Possible "insider dealing" and improper conflicts of interest involving the City of Tampa's Code Enforcement policies and procedures.

15. Throughout the dispatch of his responsibilities in the above referenced investigations, THURMAN'S commitment to ethical and honorable police investigation methods, and his strict commitment to the truth, apparently aroused the ire of powerful and/or politically motivated individuals, including the Defendant and the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny.

16. In an attempt to divert THURMAN'S investigative efforts away from the exposure of possible wrongdoing committed by "powerful and/or politically motivated individuals," or exposed the wrongdoing of other officers, THURMAN has been threatened, harassed, physically accosted, inappropriately passed over for promotions which THURMAN sought and for which he was fully qualified, inappropriately subjected to unfounded Internal Affairs investigations, which investigations were purposely left "open" to interfere with possible promotions THURMAN could have otherwise been eligible for, and, finally, THURMAN has been intentionally and purposely assigned police duties that, in light of his integrity and ability, are demeaning, and a manifestation of the Defendant's custom and practice of imposing adverse assignments as a form of punishment, both through humiliation and further punishment through the decrease in income brought about by inappropriate reassignments.

17. Based on information and belief, as result of THURMAN'S failure to participate in unlawful misrepresentations or the failure to report unlawful activity related investigations specified above, THURMAN was attacked by a man using a "crow bar" while THURMAN was attending the Central Maintenance Facility at 1508 Clark Street.

18. In November 1991, THURMAN'S truck tires were cut in the TPD parking lot, and THURMAN'S automobile battery terminal wires were also cut.

19. As an example of the continuing pattern and practice of Defendants, THURMAN was offered a promotion to Sergeant by R.L. Smith, as agent of Defendant CITY. In February of 1992, he was directed to misrepresent facts regarding a pending investigation by the Assistant Chief of Police. THURMAN refused and was informed that he would have "a hard time keeping his job." No promotion was given as promised.

20. In 1994, THURMAN was high on the "promotion list," but in light of his failure to cooperate in misrepresenting factual aspects of pending investigations, THURMAN was told in 1995 to "f*** himself," by Defendant's agent Chief Holder, who further stated that he would never promote THURMAN and that if THURMAN had a problem with that, he could sue Holder since "it wasn't his f***ing money."

21. In 1995, an internal affairs investigation, 95-169, was commenced against THURMAN. Numerous acts were committed by agents of Defendant against THURMAN, all of which were part of the pattern and practice of Defendant's actions:

   a. Internal Affairs Detective Sterzer made untrue statements about THURMAN and placed misleading documents into the investigative file relating to the proceeding.

   b. On July 15, 1996, THURMAN was recommended for termination through staff due to false testimony given by agents of Defendant.

   c. On December 4, 1996, the internal affairs case was overturned.

   d. Also on December 4, 1996, THURMAN was discovered to have reported to the Department of Law Enforcement regarding information on

corruption and unlawful activities. The FDLE apparently contacted Chief Holder, at which time THURMAN was called back into Internal Affairs and verbally abused for having made such a report.

22.     In 1999, THURMAN was subjected to an Internal Affairs investigation (IAB Case 99F-46). In this investigation, THURMAN was charged with (1) improper use of military leave, (2) requesting inappropriate compensation, and (3) untruthfulness. There was no basis to the charges made, which charges were pursued in bad faith, again as a manifestation of the customs, policy, and practice of punishing officers that would not participate in the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny.

23.     The allegations contained in IAB Case 99F-46, emanated from THURMAN'S ongoing medical problems connected with his participation in "Desert Storm," where it was alleged against THURMAN that he had utilized less time than indicated for medical evaluations and treatments on or about April 1, 1998, further allegations that in August of 1998, THURMAN inappropriately requested fully justified military leave, and also inappropriately requested fully justified military leave in October of 1998.

24.     Ultimately, during the investigation of the allegations of wrongdoing contained in IAB Case 99F-46, during September 6, 2000, THURMAN was "brought in for questioning" to the office of then Major Tina Wright. During this investigation, THURMAN demanded the presence of an attorney and the presence of an appropriate representative from the Police Benevolent Association (PBA), both of which requests were properly founded and made, and both of which requests were denied. This act on behalf of Defendant was a manifestation of the

policy and practice utilized by the Tampa Police Department to create a hostile environment and impose inappropriate forms of punishment and pressure.

25. In the conspiratorial effort to harass and damage THURMAN, KIRBY made a complaint in August 1999, against THURMAN, alleging that THURMAN had falsified a Request for Leave in April 1998, well over one year after the date of the alleged act by THURMAN.

26. In the investigation of the allegations against THURMAN, STERZER met with a Mr. Smith at the VA Hospital and, based on information and belief, attempted to harass and influence Mr. Smith to agree to misrepresent various issues regarding THURMAN's VA Hospital medical appointment. These actions were a manifestation of the customs, policy, and practice of punishing officers that would not participate in the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny.

27. In the conduct of the 1999, IA investigation, WRIGHT, GROSSI, and MURRAY, falsely imprisoned THURMAN on September 6, 2000, as elaborated on below.

28. In the conduct of this 1999 investigation, THURMAN was threatened physically and was prevented from leaving the office of TINA WRIGHT through threatened force and the locking of the door to the office. THURMAN was also pressured to sign an Affidavit admitting to wrongdoing, which admissions were false. THURMAN was threatened that if he did not sign such a document, he would be terminated from the Tampa Police Department, or subjected to harassing and inappropriate treatment in connection with his responsibilities as a police officer.

29. In the conduct of the 1999 investigation, representatives of TPD were notified that THURMAN's attorney was unavailable to represent THURMAN during IA interrogations. On or about December 19, 2001, STERZER ordered THURMAN to report to IA with the knowledge that THURMAN would not be accompanied by an attorney.

30. In dealing with the above specified investigation, the officers identified herein as being under the supervision of the Defendant provided negative and misleading information about THURMAN'S character and integrity, resulting in a negative and derogatory newspaper article containing negative and disparaging comments regarding THURMAN. These actions reflected a manifestation of the customs, policy, and practice of punishing officers that would not participate in the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny.

31. In May of 2000, THURMAN was removed from a TPD "in service" training class and required to turn over his gun and otherwise humiliated in front of the other attendees of the "in service" training. The other attendees of the "in service" training class were notified that THURMAN was being terminated from the force.

32. In December of 2001, STERZER misrepresented to other Officers of the TPD that THURMAN was "a liar" and was "fired from the Army."

33. During the pendency of what should have been a very simple investigation, THURMAN was placed on May 24, 2000, with the Report and Information Unit (RIU) for approximately seven (7) months. This "reassignment" was a reflection of the policy and practice of the Tampa Police Department to utilize inappropriate reassignments as a form of humiliation and punishment to THURMAN. During the period of time that THURMAN was in the RIU,

MURRAY, in December of 2000, harassed and intimidated THURMAN relative to THURMAN's desire to be represented by an attorney during the IA investigation.

36. As a direct and proximate result of the continuous threats, harassment, wrongful imprisonment, misrepresentations, and other improper actions committed, as a manifestation of the custom and practice of "punishing" TPD officers who would not participate in the overall conspiracy of hiding and/or being complicit in scandal and corruption, which custom and practice was implemented by the above specified officers of the TPD, THURMAN suffered a stress related heart attack on January 7, 2001. As evidenced by the paragraph in this Complaint, the custom and practice of harassment and intimidation continued even after THURMAN'S return to the TPD after his attempt to recover from his heart attack.

35. As a result of THURMAN'S heart attack, THURMAN was off work for seven (7) months. When he was deemed capable of doing so THURMAN returned to active duty with the TPD in July of 2001, at which time THURMAN'S gun and TPD cruiser were returned to him. The IA investigation was still pending at this time.

36. Both the Complaint Review Board and Deputy Chief John Bushell stated that the IA investigation was unfounded, however, the supervision of the IA case was given to Deputy Chief JANE SILING, who allegedly told Bushell that THURMAN "was guilty." The statement that THURMAN "was guilty" was also made to Bushell by WRIGHT.

37. Based on information and belief, Bushell asserted that there was no evidence to support any of the claims against THURMAN, to which SILING responded that she did not care that there was no evidence to support the claims, since, in her opinion, THURMAN was guilty.

38. Throughout all periods of time relevant to this action, THURMAN has been frequently and conspicuously followed by Internal Affairs Investigators and has repeatedly received threatening phone calls to his home, all believed to be perpetrated by agents of Defendant. On the basis of these repeated phone calls, THURMAN registered a complaint with the Hillsborough County Sheriff's Office.

39. On March 27, 2002, Counsel for THURMAN provided a Notice of Intent to Sue Pursuant to Florida Statutes Section 768.28. A copy of this "six month letter" is attached hereto as Exhibit "A." This March 27, 2002, correspondence was forwarded to the City of Tampa, in care of Mayor Dick Greco, and to the TPD in care of Bennie Holder. The letter articulated that the claims asserted were based on, "...participation in conspiring to and committing a continuing pattern, evidencing an accepted custom and practice, of engaging in (1) wrongful denial of promotion and advancement; (2) false imprisonment; (3) continuing threats of wrongful dismissal; (4) abuse of Internal Affairs investigative processes; (5) libel, slander, and/or defamation; (6) creation and maintenance of a hostile environment, all such acts, customs, and practices causing, individually and cumulatively, pain and suffering and other consequential damages." A copy of the certified mailing cards and receipts is attached hereto as composite Exhibit "B."

40. Subsequent to the allegations contained in the March 27, 2002, Notice of Intent to Sue, the investigation of IAB Case 99F-46 was concluded, with the determination that all charges against THURMAN were "not sustained."

41. Subsequent to the conclusion of IAB Case 99F-46, THURMAN has continued to receive threats of termination from the TPD, intentional infliction of emotional distress, and the

continued creation of a hostile working environment.

## V. GENERAL ALLEGATIONS SUPPORTING DECLARATORY AND INJUNCTIVE RELIEF

42. Plaintiff has a clear legal right to engage in gainful employment without interference by the Defendant, its agents, servants or employees. Any such interference may only take place after Plaintiff has been afforded due process of law, as guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution and Article I, § 9, of the Constitution of the State of Florida; Plaintiff has been denied due process of law by the unconstitutional application of the customs and practices of Defendant at issue herein on the exercise of THURMAN'S fundamental constitutional rights, and his fundamental property right in his job, as well as his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and wrongful imprisonment, and THURMAN'S First Amendment rights to be able to speak freely about controversial issues and scandals, and the customs, policy, and practice of punishing officers that would not participate in the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny.

43. Plaintiff's position, as set forth in this Complaint, is legally sound and supported by fact and law. The Defendant's action, however, has created a bonafide controversy between the parties, and Plaintiff is in doubt as to his rights, privileges and immunities with respect to the conduct at issue herein. Plaintiff requires, therefore, a declaratory judgment declaring his rights, privileges and immunities. There is a clear, present, actual, substantial and bonafide justiciable controversy between the parties.

44. Plaintiff, as a direct and proximate result of the conduct, customs, and/or policies of the Defendant, has been and will be required to suffer the continued deprivation of his

constitutional rights and privileges, causing the Plaintiff severe hardship and continued damages if the relief requested herein is not granted.

45. Plaintiff has no adequate remedy at law. No amount of money damages could adequately compensate the Plaintiff for the irreparable harm described herein. The Plaintiff in this case wishes to exercise his fundamental constitutional rights which are guaranteed to him under the United States Constitution and the laws of the State of Florida. Neither damages, replevin, attachment nor any other legal remedy will suffice to safeguard the exercise of that right. In order to constitute an "adequate" legal remedy, the remedy at law must be plain, certain, prompt, speedy, sufficient, complete, practical, and efficient in attaining the ends of justice. It is unquestionable that no legal remedy would ever suffice to properly address state action that ultimately results in denying citizens rights guaranteed by the United States Constitution and the laws of the State of Florida.

46. Plaintiff and the public at large will suffer irreparable injury if injunctive relief is not granted, and Defendant is further permitted to enforce the customs, policies, and practices at issue herein. The loss of rights guaranteed as fundamental by both the State and Federal Constitution is so serious that, as a matter of law, irreparable injury can be presumed and, in such an instance, damages are both inadequate and unascertainable.

47. The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of customs, policies, and practices that are designed to and do exhibit a callous indifference to Plaintiff's constitutional rights.

48. All conditions precedent to the institution and maintenance of this cause of action have occurred or have been performed.

49. The acts, practices and jurisdiction of Defendant as set forth herein, were and are being performed under color of state law and therefore constitute state action within the meaning of the Fourteenth Amendment to the Constitution of the United States.

## COUNT I
## CONSTITUTIONAL VIOLATIONS MANIFEST IN THE CUSTOMS, PRACTICES, AND POLICIES OF DEFENDANT

50. Plaintiff realleges and incorporates paragraphs 14 through 41, supra, as if fully set out herein.

51. Defendant has implemented a policy and practice of both formally and informally "punishing" police officers by initiating baseless Internal Affairs investigations, and purposely assigning those deviating from the customs, practices, and policies of secrecy and protection to police duties that, in light of the officers integrity and ability, are demeaning, and a manifestation of the Defendant's custom and practice of imposing adverse assignments as a form of punishment, both through humiliation and further punishment through the decrease in income brought about by inappropriate reassignments, interfering with fundamental rights to due process and property which may only be taken after Plaintiff has been afforded due process of law, as guaranteed by the Fifth and Fourteenth Amendment to the United States Constitution and Article I, § 9, of the Constitution of the State of Florida.

52. Plaintiff has been denied due process of law by the unconstitutional application of the customs and practices of Defendant at issue herein on the exercise of THURMAN'S fundamental constitutional rights, and his fundamental property right in his job.

53. Plaintiff has also been denied his Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and wrongful imprisonment, as effected by the conduct of the Internal Affairs investigation where THURMAN was threatened physically and was prevented from leaving the office of TINA WRIGHT through threatened force and the locking of the door to the office, as well as the other threats and intimidation described in paragraph 23.

54. Plaintiff has also been denied his First Amendment rights to be able to speak freely about controversial issues and scandals, and the customs, policy, and practice of punishing officers that would not participate in the policy and practice of nurturing an environment of secrecy and protecting unethical and/or illegal police activities from scrutiny, which First Amendment rights are "chilled" through the threats of the imposition of the formal and informal polices, customs, and practices specified herein.

55. Defendant, CITY OF TAMPA, as a matter of policy and practice, both through the utilization of formal procedures and the utilization of informal procedures and practices, has with deliberate indifference failed to adequately discipline, train, or otherwise direct police officers concerning the rights of other police officers, thereby directly causing the representatives and agents of Defendant to engage in the unlawful conduct described herein.

56. Defendant, CITY OF TAMPA, as a matter of policy and practice, both through the utilization of formal procedures and the utilization of informal procedures and practices, has with deliberate indifference failed to properly sanction or discipline police officers, including the representatives of Defendant specified in this action for violations of the constitutional rights of other police officers thereby causing the representatives and agents of Defendant to engage in the unlawful conduct described herein.

57. Defendant, CITY OF TAMPA, as a matter of policy and practice, both through the utilization of formal procedures and the utilization of informal procedures and practices, has with deliberate indifference failed to sanction or discipline police officers including the representatives of Defendant specified in this action who are aware of and subsequently conceal the violations of the constitutional rights of victimize police officers, as committed by the agents of the Defendant, thereby causing and encouraging the representatives and agents of Defendant to engage in the unlawful conduct described herein.

58. The actions of Defendant, CITY OF TAMPA, have all been committed under color of state law and have deprived Plaintiff of his rights, privileges, and immunities under the Constitution of the United States, in particular, the rights to be secure in his person and property, to be free from the excessive use of force, to be free from false imprisonment, and to enjoy due process.

59. By the actions specified herein, Defendant, CITY OF TAMPA, by and through its agents, have deprived Plaintiff of rights secured by the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. Section 1983.

## COUNTS ALLEGING UNLAWFUL TORTIOUS CONDUCT

## COUNT II

## WRONGFUL DENIAL OF PROMOTION AND ADVANCEMENT

60. Plaintiff realleges and incorporates paragraphs 14 through 41, supra, as if fully set out herein.

61. At all times relevant to this Complaint, Defendant and agents of Defendant, were enforcing the customs, practices, and policies of the Tampa Police Department.

62. As the direct and proximate result of these said customs, practices, and policies, THURMAN has been wrongfully denied of appropriate promotion and advancement to positions within the Police Department for which he has been fully qualified and entitled.

63. As a direct and proximate result of the stated actions of Defendant, THURMAN has suffered actually consequential and special damages.

## COUNT III

## FALSE IMPRISONMENT

64. Plaintiff realleges and incorporates paragraphs 22 through 30, supra, as if fully set out herein.

65. At all times relevant to this Complaint, Defendant and agents of Defendant, were enforcing the customs, practices, and policies of the Tampa Police Department.

66. As the direct and proximate result of these said customs, practices, and policies, THURMAN has been subjected to false imprisonment as specifically alleged in the above incorporated paragraphs.

67. As a direct and proximate result of the stated actions of Defendant, THURMAN has suffered actually consequential and special damages.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

68. Plaintiff realleges and incorporates paragraphs 14 through 41, supra, as if fully set out herein.

69. At all times relevant to this Complaint, Defendant and agents of Defendant, were enforcing the customs, practices, and policies of the Tampa Police Department.

70. As the direct and proximate result of these said customs, practices, and policies, THURMAN has been subjected to the intentional infliction of emotional distress by the agents of Defendant, causing not only mental pain and suffering, but physical pain and suffering as manifested in THURMAN'S heart attack.

71. As a direct and proximate result of the stated actions of Defendant, THURMAN has suffered actually consequential and special damages.

## COUNT V

## ABUSE OF PROCESS

72. Plaintiff realleges and incorporates paragraphs 21 through 30, supra, as if fully set out herein.

73. At all times relevant to this Complaint, Defendant and agents of Defendant, were enforcing the customs, practices, and policies of the Tampa Police Department.

74. As the direct and proximate result of these said customs, practices, and policies, THURMAN has been subjected to an abuse of process through the wrongful utilization of the Internal Affairs investigation procedures as specified in the above incorporated paragraphs.

75. As a direct and proximate result of the stated actions of Defendant, THURMAN has suffered actually consequential and special damages.

## COUNT VI

## LIBEL, SLANDER AND/OR DEFAMATION

76. Plaintiff realleges and incorporates paragraphs 21 through 37, supra, as if fully set out herein.

77. At all times relevant to this Complaint, Defendant and agents of Defendant, were enforcing the customs, practices, and policies of the Tampa Police Department.

78. As the direct and proximate result of these said customs, practices, and policies, THURMAN has been the victim of libel, slander and/or defamation committed by agents of Defendant, which agents either verbally or in writing accused THURMAN of illegal or unlawful acts, misrepresented facts that would subject THURMAN to contempt, humiliation, embarrassment, and retaliation, all is the direct and proximate result of the publication of said statements by agents of Defendant to third parties.

79. As a direct and proximate result of the stated actions of Defendant, THURMAN has suffered actually consequential and special damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this Honorable Court to declare the acts, practices, and customs of the Defendant and agents of Defendant to violate the aforementioned constitutional rights of the Plaintiff, to enjoin any further constitutional violations through the conduct of the Defendant and agents of Defendant, to award Plaintiff compensatory, consequential, and special damages in an amount to be determined by this Court, plus an award of the costs of this action, attorney's fees for reasonable services provided in this action pursuant to 42 U.S.C. § 1988, and all such other relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

80. Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

_____
Luke Lirot, Esquire
Florida Bar Number 714836
Luke Charles Lirot, P.A.
112 North East Street, Suite B
Tampa Florida 33602-4108

813/221-9533 Telephone
813/221-9175 Facsimile
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was U.S. Mail / Hand Delivery to Thomas M. Gonzalez, Esquire, Thompson, Sizemore & Gonzalez, P.A., 501 East Kennedy Boulevard, Suite 1400, Tampa, Florida 33602, on 23rd day of June, 2003.

Luke Lirot, Esquire
Florida Bar Number 714836